Howard RUFF and Kay Ruff, husband and wife; Charles Bates and Ellen Bates, husband and wife; and Rodney Petersen and Marilyn Petersen, husband and wife, Plaintiffs,

v.

ENSIGN–BICKFORD INDUSTRIES, INC. a Connecticut corporation; the Ensign–Bickford Company, a Connecticut corporation; Mallinckrodt Inc., a New York corporation Defendants.

No. 2:99–CV–120B.

United States District Court,
D. Utah,
Central Division.

Aug. 27, 2001.

David K. Isom, J. Preston Stieff, David K. Isom Law Offices, Salt Lake City, UT, Lynn Lincoln Sarko, Margaret E. Wetherald, Keller Rohrback, Seattle, WA, Shane R. Swindle, Laurie B. Fields, Gary A. Gotto, Mark D. Samson, Dalton Gotto Samson & Kilgard PLC, Phoenix, AZ, for plaintiffs.

Mark W. Dykes, LeBeouf Lamb Greene & MacRae, Salt Lake City, UT, Eden C. Steele, Gary E. Parish, Arthur P. Mizzi, LeBoeuf Lamb Greene & MacRae, Denver, CO, for defendants.

MEMORANDUM OPINION & ORDER

BENSON, District Judge.

## Introduction

This matter is before the Court on defendants' combined motion for summary judgment and motion to exclude the testimony of plaintiffs' medical causation expert, Dr. Dennis Weisenburger. Defendants Ensign-Bickford Industries, Inc., the Ensign-Bickford Company, and Mallinckrodt Inc., jointly filed the instant motion. Also before the Court are plaintiffs' motions in limine to exclude three of defendants' medical experts, Dr. Phillip Guzelian, Dr. Robert James and Dr. John Ward. All plaintiffs, Howard Ruff and Kay Ruff, Charles Bates (deceased) and Ellen Bates, Rodney Petersen and Marilyn Petersen, filed joint motions in limine seeking to exclude defendants' medical experts.

From June 21 to June 26, 2001, the Court held an evidentiary hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court has reviewed the testimony and exhibits presented at the evidentiary hearing, the opinions submitted by the expert witnesses, the relevant scientific literature, the briefs supporting and opposing the motions, and the pertinent case law. The Court now issues the following memorandum opinion and order.

## Background

Defendants are present and former owners of an explosives manufacturing plant, located at the mouth of Spanish Fork Canyon, one to two miles south of Mapelton, Utah.[1] In June of 1986, one of the plant's disposal pond liners failed, causing hundreds of thousands of gallons of dilute nitric acid solution to be released into the ground. Three years after the nitrate solution leaked into the ground, the City of Mapleton closed one of its municipal water wells due to high levels of nitrates. Prior to 1986, other contaminants allegedly seeped into the Mapelton groundwater as a result of defendants' improper hazardous waste disposal practices. Defendants are presently engaged in an expansive remediation effort with the State of Utah's Division of Water Quality to clean up chemicals which have contaminated certain areas near the plant.

Plaintiffs are or were residents and neighbors in the small community of Mapelton. Plaintiffs allege that they have suffered personal injuries from the ingestion of various chemicals which seeped into their private well water from the plant. Each plaintiff has been diagnosed

1. The plant has been in operation since the 1940's. From 1967 through 1982, the IMC Group, which later became defendant Mallinckrodt, Inc., owned and operated the explosives manufacturing plant located near Mapleton. In January of 1982, the Trojan Corp. purchased the plant and continued operating it. Defendant Ensign-Bickford Industries, Inc. acquired the stock for the plant from Trojan in January of 1987. In 1996, defendant Ensign-Bickford Co. merged with Trojan, and the Ensign-Bickford Company assumed operation of the plant.

with cancer, specifically, small cleaved B-cell follicular non-Hodgkins lymphoma (NHL). Follicular NHL comprises approximately one third of all NHLs, and the small cleaved B–Cell variant comprises only 10% of all NHLs. Mrs. Petersen was diagnosed with NHL in 1984, two years prior to the liner failure at the explosives plant. She was the first of the present plaintiffs to contract cancer. The second plaintiff to develop NHL was Mr. Ruff, who was diagnosed in 1990. Lastly, Mr. Bates learned in 1992 that he had contracted NHL. Mr. Bates recently passed away as a result of complications with NHL.

The chemicals at issue in this litigation have been grouped by the parties into four separate categories: 1) Royal Demolition Explosives ("RDX"), 2) Hydrazines, including 1,1 dimethylhydrazine and 1,2 dimethylhydrazine, 3) N-nitroso compounds or nitrosamines, including MNRDX, DNRDX, and TNRDX, and 4) Nitrate esters, including EGDN, DEGDN, TMETN, and BTTN.[2] The carcinogenicity of these chemicals and their ability to cause NHL in humans and specifically in each plaintiff are at the heart of this case and the instant motions in limine. If plaintiffs are unable to present credible evidence, through a medical expert, that the above chemicals were more likely than not the cause of their cancer, then summary judgment is appropriate in favor of defendants.

Plaintiffs' medical causation expert, Dr. Dennis Weisenburger, concluded in his report and testified at the *Daubert* hearing, that the above chemicals, either singly or in combination, more likely than not caused each of the plaintiffs' NHL. Defendants' medical experts, Dr. Phillip Guzelian and Dr. Robert James, submitted rebuttal reports and testified at the *Daubert* hearing for the sole purpose of attacking Dr. Weisenburger's methodology and conclusions with respect to the causal link between the chemicals at issue and plaintiffs' NHL. Dr. John Ward, retained by defendants as a medical causation expert, concluded in his expert report and at the *Daubert* hearing that there are no known causes of NHL in humans. Each of the above experts' testimony is subject to a motion in limine filed by the opposition. However, the reliability of Dr. Weisenburger's methodology in reaching his conclusion, that the above chemicals more likely than not caused plaintiffs' NHL, is the central focus of each expert report and the instant motions.

## Discussion

This case presents the issue whether Dr. Weisenburger employed a reliable scientific methodology when concluding that RDX, its break-down products, and nitrates, either singly or in combination, more likely than not caused plaintiffs' NHL. Defendants argue that Dr. Weisenburger's methodology was flawed primarily because of the lack of epidemiologic[3]

2. For purposes of this motion, the Court will consider nitrosamines and nitrate esters as one. *See infra,* discussion section II., p. 14.

3. Epidemiology is the branch of medical science that studies the etiology, or the cause, of disease in human populations. Epidemiologic studies and reports are much desired by litigants in cases involving medical causation. There are several different forms that epidemiological studies take in the areas of occupational medicine and toxicology. The various research designs differ in the evidentiary weight they lend to a hypothesis that exposure to a given substance causes a given condition. The epidemiological studies relied upon by plaintiffs' expert in this case fall into two general categories: (1) case-control studies or reports and (2) ecological studies. Case-control studies compare the exposure histories of a population group who exhibit a particular health condition with a population group who do not exhibit the health condition but who are comparable in characteristics other than exposure. Case-control studies are scientifically reliable investigations and test specific

evidence demonstrating a link between NHL and the chemicals from defendants' plant. Plaintiffs counter with Dr. Weisenburger's scientific and medical credentials, his extensive research and experience in the relevant area, and with several epidemiological and animal studies that indicate a connection between the chemicals from defendants' plant and NHL.

In the final analysis the case for the admissibility of Dr. Weisenburger's opinions under rule 702 presents a challenging set of arguments for the Court, with each side presenting arguments that are thoroughly developed and skillfully argued. In the Court's final analysis, two factors tip the scale in favor of admissibility. First, as discussed within each chemical section below, the Court finds that defendants overstate the lack of epidemiological data available in favor of plaintiffs' case, and understate the positive animal data. Second, Dr. Harber's testimony at the *Daubert* hearing, that Dr. Weisenburger's conclusions are based on reliable scientific methodologies and are supported by sufficient facts and data, was particularly helpful and persuasive to the Court. Dr. Harber's testimony is discussed in further detail below.

### *Daubert Standard*

Federal Rule of Evidence 702 was recently amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. Amended rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (as modified Dec. 1, 2000). "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Goebel v. Denver and Rio Grande Western Railroad Company,* 215 F.3d 1083, 1087–89 (10th Cir.2000) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). This "gatekeeper" function requires the Court to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts. *See Daubert* at 592, 113 S.Ct. 2786. In making these determinations about the reliability of the theory which is the subject of the expert testimony, the Court may consider whether (1) it can be and has been tested, (2) the theory or technique has been subjected to peer review and publication, (3) there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation, and (4) the theory has been generally accepted in the relevant scientific community. *Daubert,* at 593–94, 113 S.Ct. 2786.

etiological hypotheses to confirm and quantify degrees of health risk related to causal exposures. Ecological studies correlate cancer incidence or mortality rates with environmental factors within a geographic area, and do not gather case-specific data with regard to actual exposure. Ecological studies tend to be less reliable than case-control studies and are given little evidentiary weight with respect to establishing causation. However, they are valuable for generating strong causation hypotheses linking a particular substance to an illness. *See* Weisenburger O.R. at 12.

However, the Tenth Circuit "recognizes that the district court need not 'recite the *Daubert* standard as though it were some magical incantation, or apply all of the reliability factors suggested in *Daubert or Kumho [Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)*].*'" *Goebel* at 1089 (quoting *Ancho v. Pentek Corp.,* 157 F.3d 512, 518 (7th Cir.1998)). "The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *See Mitchell,* 165 F.3d 778, 781. "What is necessary is that the expert arrived at his ... opinion by relying upon methods that other experts in his field would reasonably rely upon in forming their own, possibly different opinions, about what caused the patient's disease." *Head v. Lithonia,* 881 F.2d 941 (10th Cir. 1989).

The gatekeeper inquiry under Rule 702 is ultimately a flexible determination, keeping in mind that rejection of expert testimony has been the exception rather than the rule. *See Goebel* at 1089; *see also* Fed.R.Evid. 702, advisory committee notes (Dec. 1, 2000). "Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible testimony." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786.

***Rule 702 (Daubert) Application***

**1. Dr. Dennis Weisenburger**

Dr. Weisenburger's qualifications in the field of NHL have not been seriously questioned by defendants. In fact, defendants attempted to retain Dr. Weisenburger to serve as an expert for them in this case. Dr. Weisenburger is a medical doctor and a member of the University of Nebraska Medical Center faculty. Dr. Weisenburger has been a member of the University of Nebraska's respected "Lymphoma Study Group" for twenty years. During the past twenty years, the Lymphoma Study Group, and Dr. Weisenburger, have researched lymphomas in the context of animal models, human incidence and distribution, and the etiology of NHL, including its association with nitrates. In 1996, Dr. Weisenburger co-authored an extensive article reporting animal NHL carcinogenisis studies involving n-nitroso compounds. *See* M.H. Ward et al., *Drinking Water Nitrate and the Risk of Non–Hodgkin's Lymphoma,* 7 Epidemiology 465–471 (1996) (the "*Ward*" study). He was the organizer and director of an epidemiological study of NHL and nitrate contaminated water, in collaboration with the National Cancer Institute. Dr. Weisenburger is the principal author, or co-author, of over 50 peer-reviewed published articles concerning NHL causation. Additionally, he has been invited to speak at numerous lectures involving topics of NHL epidemiology and etiology. Dr. Weisenburger is a member of the World Health Organization panel to revise the classification system for NHL. He is also a member of the Center for Environmental Toxicology at the University of Nebraska.

Based on Dr. Weisenburger's extensive background and experience in NHL causation, the Court finds him well qualified to testify generally as an NHL medical causation expert. The pertinent inquiry here is whether Dr. Weisenburger employed a reliable scientific methodology in reaching his conclusions in this case and whether his conclusions are based on sufficient facts and data. *See* Fed.R.Evid. 702.

Upon a review of the instant case, the Court is satisfied that Dr. Weisenburger has employed scientifically valid methodologies and that his causation opinions are based on sufficient facts and data. In arguing to the contrary, defendants confuse, at times ignore, the crucial distinction

between the admissibility of expert scientific testimony and the weight such testimony should be afforded by the trier of fact. *See Lakie v. Smithkline Beecham,* 965 F.Supp. 49, 55 (D.D.C.1997).

Dr. Weisenburger generally employed the same methodology for each of the chemicals from defendants' plant. First, Dr. Weisenburger interviewed and medically examined Charles Bates, Howard Ruff, and Marilyn Petersen. Based on his extensive experience with NHL, Dr. Weisenburger confirmed the diagnosis made by previous doctors, that plaintiffs were afflicted with small, cleaved, B-cell, follicular NHL. That examination also revealed that plaintiffs were exposed to the same groundwater, and/or food grown with ground water, that was contaminated by chemicals from defendants' plant. These chemicals included the explosive compound RDX, and its breakdown products and nitrates.[4]

After diagnosing plaintiffs with NHL and determining their exposure to defendants' chemicals, Dr. Weisenburger assembled relevant scientific literature specifically pertaining to RDX, hydrazines and nitrates. Dr. Weisenburger reviewed this literature to determine whether a causal link existed between defendants' chemicals and NHL. Dr. Weisenburger first looked to the available epidemiological data associating defendants' chemicals with NHL. This data is limited because human exposure to RDX and its breakdown products is rare. However, in 1995, the Utah Department of Health conducted an epidemiologic study to determine whether defendants' chemicals were causing an increased risk of cancer in Mapelton. *See* J. Contreras et al., *An Investigation of Cancer Incidence Rates in Mapelton, Utah, 1978–1995, Final Report, October 1, 1997,* Bureau of Epidemiology, Utah Dept. of Health (the *"Mapelton"* study). Although the initial result of this study was negative for NHL, Dr. Weisenburger reanalyzed the assembled data and found a statistically significant increased risk of NHL in Mapelton.[5]

Dr. Weisenburger also reviewed and analyzed other human data concerning the effect of defendants' chemicals on the human population. For example, Dr. Weisenburger was extensively involved in two pre-litigation studies involving the association of nitrate intake in humans and NHL. *See Potential Health Consequences of Ground-water Contamination by Nitrates in Nebraska,* I. Bogardi & R.D. Kuzelka, eds., Nitrate Contamination, NATO Series, Vol. G30, Berlin: Springer–Verlag, 309–15 (1991), and M.H. Ward et al., *Drinking Water Nitrate and the Risk of Non–Hodgkin's Lymphoma,* 7 Epidemiology 465–471 (1996) (the *"Ward"* study). These studies found a statistically significant increase of NHL in populations exposed to high levels of nitrates.

The next step in Dr. Weisenburger's methodology was to assess and review existing evidence related to the effect defendants' chemicals had on animals. RDX injected into mice at high doses caused a statistically significant increase in liver cancer. *See* P.M. Lish, et al., *Determination of Chronic Mammalian Toxicologic Effects of RDX* IITRTI Project No. L6121, Study No. 7 (1984) (the *"Lish"* study). The animal evidence reviewed by Dr. Weisenburger regarding hydrazines dem-

4. Dr. Weisenburger relied on the report prepared by plaintiffs' experts Shepherd Miller Inc. ("SMI") for the estimated dose plaintiffs were exposed to through their groundwater and other means. The SMI report is subject to a separate motion in limine filed by defendants.

5. The re-analysis of the *Mapelton* study is discussed in detail below. *See infra* p. 1282.

onstrated a much stronger causal link to NHL, than was the case with RDX. *See e.g.,* C.C. Haun et al., *A Six-Month Chronic Inhalation Exposure of Animals to UMDH to Determine its Oncogenic Potential,"* Proceedings of the Ninth Conference on Environmental Toxicology, 141–53 (1979) (the "*Haun*" study). The nitrate animal exposure studies also showed an association between NHL and nitrate intake.

Finally, the last step in Dr. Weisenburger's method was to assess the evidence on the individual plaintiffs. As noted, he confirmed three cases of small, cleaved, B-Cell, follicular NHL, which he found to be an unusual observation in a small and sparsely-populated area, such as Mapelton. He found that each were exposed to defendants' chemicals as reported in the SMI exposure data. For each plaintiff, Dr. Weisenburger assessed the latency period, the time of exposure to the time of their NHL diagnosis. All plaintiffs were within the expected NHL latency curve. Dr. Weisenburger then reviewed the medical histories for each plaintiff, and ruled out potential alternative causes for NHL. Based upon the above method, Dr. Weisenburger concluded that plaintiffs' NHLs were more likely than not caused by exposure to defendants' chemicals.

Defendants retained Philip Guzelian, M.D., and Robert James, Ph.D., who criticized Dr. Weisenburger's methodology in a joint report. Plaintiffs in turn acquired the services of Dr. Philip Harber, a professor of medicine at the UCLA Medical School and Director of UCLA's Occupational & Environmental Medicine Program to rebut the criticism of Drs.' Guzelian and James and to support both the methodology used by Dr. Weisenburger, and the sufficiency of the facts and data that serve as the basis for Dr. Weisenburger's opinion. As stated earlier, the Court found Dr. Harber's testimony to be persuasive. Dr. Harber is currently involved in the study of causation analysis and is one of the few peer-review published authors on the subject. Dr. Harber has recently been invited to lecture large groups of medical doctors in three different countries on the subject of assessing causation. Defendants' expert, Dr. Guzelian, recognizes Dr. Harber as an expert in the field of causation methodology and has cited his opinions in reports for other litigation.

At the *Daubert* hearing, Dr. Harber summarized Dr. Weisenburger's methodology in this way:

> Dr. Weisenburger, first of all, relied on what is obviously a great deal of personal experience in the particular area. He's obviously published and seems to be a very well accepted investigator in the area, so he brings a lot to it. Second, he looked at the case-specific information. He looked at the diagnoses of the individuals, and looked at their exposures. He then looked at published literature, such as it is, both epidemiologic and animal. He also reasoned by chemical analogy and looked at the local epidemiologic data of the Mapelton area in Utah-in the two Utah studies. And then he took all of the available information, made some hypotheses, did some assessment of the hypotheses, and came to conclusions that the NHL's were related to exposure.

Plaintiffs' Ex. H at 117–119. After reviewing and analyzing the methodologies Dr. Weisenburger employed in forming his causation opinions, Dr. Harber concluded that

> The method used by Dr. Weisenburger is a reasonable, valid, and reliable scientific method. The methodological criticisms leveled by the defendants' experts on Dr. Weisenburger are flawed. The differences of opinion between Dr. Weisenburger and the defendants' experts

regarding the interpretation and weight to accord various data do not demonstrate that Dr. Weisenburger's study is unreliable or non-scientific ... [Dr. Weisenburger's method] is certainly an acceptable scientific method of reaching an opinion in this case."

Harber, O.R. at 2, 4. As discussed below, and in line with Dr. Harber's testimony, the record before the Court establishes that Dr. Weisenburger's causation opinions as to each category of chemicals, with the exception of RDX by itself, are based on sufficient facts and data and reliable methodologies.

■ The parties agree that Dr. Weisenburger's first task is to demonstrate general causation, i.e., that the chemicals from defendants' plant, RDX, hydrazines, and nitrates, are *generally capable* of causing NHL in humans. Second, Dr. Weisenburger must show specific causation, that the exposures for each plaintiff more likely than not caused their NHL. *See e.g., Raynor v. Merrell Pharmaceuticals, Inc.,* 104 F.3d 1371, 1376 (C.A.D.C.1997) ("causation in toxic tort cases is discussed in terms of general and specific causation").

### General Causation

As a preliminary matter, the Court addresses defendants' assertion that plaintiffs must not only show that the chemicals from defendants' plant are generally capable of causing NHL, but they must show that they are generally capable of causing the specific sub-type of NHL from which plaintiffs suffer. After reviewing both defendants' and plaintiffs' arguments on this issue, the Court finds that plaintiffs must only show that the chemical at issue is capable of causing NHL.

Defendants cite *Mitchell v. Gencorp Inc.,* 165 F.3d 778 (10th Cir.1999), to support their "specificity" argument. In *Mitchell,* plaintiffs attempted to show that because benzene causes AML (a type of leukimia) in humans, it most likely caused CML, a different type of leukemia. The Tenth Circuit found two primary flaws in this argument. First, plaintiffs were never exposed to benzene. Rather, plaintiffs were only exposed to a chemical that was related to benzene. Second, benzene has a long history with a plethora of epidemiological data showing the link between benzene and AML, with little or no studies showing that benzene is a cause of CML.

Here, we do not have the benefit of years of epidemiological studies regarding the chemicals from defendants' plant. These are not chemicals that have been largely tested by scientists and toxicologists. Epidemiological studies in this case are limited with regard to both the chemicals from defendants' plant and the different etiologies for NHL subtypes. Therefore, the Court finds that plaintiffs' expert opinion need not include data showing studies of the exact subtype of plaintiffs' NHL to satisfy their general causation burden.

### 1. RDX

■ Defendants argue that Dr. Weisenburger's RDX conclusions as to general causation are based on insufficient facts and data, resulting in too great an analytical gap between the data and the opinion proffered. *See General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). In the case of RDX, the Court agrees.[6] Dr. Weisenburger concedes, in his opening and rebuttal

6. Plaintiffs' former expert, Dr. Erzailson, did not agree with Dr. Weisenburger's conclusion that RDX was carcinogenic in humans and that it more likely than not caused plaintiffs' NHL. Rather, Dr. Erzailson thought the carcinogenecity of RDX came through its breakdown products. Plaintiffs withdrew Dr. Erzailson as an expert in this case. They contend, however, that the withdrawal was not a result of her RDX opinions.

reports, that there is no positive or negative data regarding the carcinogenicity of RDX in humans. *See* Weisenburger O.R. p. 7, R.R. p. 6. To overcome the lack of positive epidemiological data, plaintiffs rely heavily upon a study involving laboratory mice exposed to RDX. *See* P.M. Lish, et al., *Determination of Chronic Mammalian Toxicologic Effects of RDX* IITRTI Project No. L6121, Study No. 7 (1984) (the "*Lish Study*"). According to plaintiffs, this study is "the most important piece of information about RDX as a pure compound [because it] cause[d] a statistically-significant increase of cancers in laboratory mice."[7] Plaintiffs' Resp. at 38.

The *Lish* study involved the injection of doses of RDX in male and female rats and mice. The results showed a statistically-significant increase of liver cancer in female mice, but failed to show a significant increase of liver cancer in rats or male mice. Dr. Weisenburger initially noted that there was an increase in liver lymphomas in the mice, but after it was explained to him how the data was actually compiled, he withdrew his comments. Nevertheless, plaintiffs contend that the data showing a link between RDX and liver cancer in female mice is sufficient to conclude that RDX is generally capable of causing NHL in humans. Plaintiffs argue that the *Lish* study is entitled to weight because animal carcinogenesis studies do not have to show the same type of tumor in study animals as in humans to be relevant. Plaintiffs concede, however, that an animal study is entitled to more causation weight if the study shows a correlation between animal and human cancer types.

The *Lish* study shows that female mice contracted liver cancer when injected with RDX. Plaintiffs have not shown how this correlates with their lymphomas or why it is scientifically valid to extrapolate from the study that liver cancer in female mice are predictive of human lymphomas. While the Court agrees with plaintiffs that the *Lish* study is entitled to some weight, the Court cannot conclude that Dr. Weisenburger's opinion regarding RDX, which is primarily founded on the *Lish* study, is based on sufficient facts and data. Accordingly, defendants' motion in limine is granted as it relates to Dr. Weisenburger's conclusion that RDX causes NHL in humans.

## 2. Hydrazines[8]

Defendants' *Daubert* attack on Dr. Weisenburger's hydrazine[9] opinion focuses almost entirely upon one allegedly negative epidemiology study involving workers exposed to hydrazine. *See* J. Morris, "Occupational Exposure to Hydrazine and Subsequent Risk of Cancer," 1995;52–43–45 (the "*Morris*" study). *See* Weisenburger O.R. at 21. The *Morris* study involved a 20–year observation of 427 men who worked at a hydrazine plant in the east

7. Dr. Weisenburger also notes in his report, and defendants point out, that two carcinogenesis studies of RDX in different strains of rats failed to show a statistically-significant increase in cancer. *See* Weisenburger O.R. at 7.

8. Along with Hydrazines, Dr. Weisenburger examined Azoxymethane in his report. However, as defendants correctly note, the SMI report provides no dose or exposure theory for this chemical. Without a dose or exposure estimate, the Court cannot find that Dr. Weisenburger's opinion, that Azoxymethane more likely than not caused plaintiffs' cancer, is reliable. Plaintiffs appear to agree as they did not respond to this argument in their briefing.

9. "Hydrazine is a colourless, fuming, oily liquid with an ammonia like odour. It is used as a polymerisation catalyst, a blowing agent, a reducing agent, and an oxygen scavenger in treatment of boiler water, in the synthesis of maleic hydrazide and in the manufacture of drugs. Hydrazine is also used as a rocket propellant." *Morris* study at 43.

midlands region of the United Kingdom between the years 1945–1971. The authors concluded that the "results weigh against there having been any material hazard of occupational exposure to hydrazine." *Morris* at 43. The authors added a caution, however, that because of the small number of men studied the study can only exclude people with a higher relative risk of lung cancer because the study is too limited to exclude lower relative risks. *Id. Morris* at 45. Defendants argue that because this study failed to detect an increase in health risks for men exposed to hydrazine, including a detection of NHL, Dr. Weisenburger's conclusion that hydrazine more likely than not caused plaintiffs' NHL is too far removed from actual data.

Defendants' argument fails for two reasons. First, Dr. Weisenburger directly addressed the *Morris* study in his rebuttal report and properly afforded the study little weight because of the small size of the worker population. The size of the study limits its ability to detect statistically significant increases in cancers at low relative risk levels. Furthermore, Dr. Weisenburger stated that the hydrazine workers' exposure was by inhalation which was most likely to develop lung cancer and less likely to cause cancers in other tissues, such as lymphomas. As set forth in the study itself, and as defendants' expert Dr. Grufferman agreed in his deposition, even if the incidence of lung cancer had been three times higher in the workers, the study would not have been able to detect it. Additionally, Dr. Weisenburger stated in his report that the hydrazine study did not include 1,1 or 1,2 dimethylhydrazine, which are other hydrazine compounds plaintiffs are alleged to have ingested.

Second, defendants ignored, except in a footnote, and failed to address the positive hydrazine animal studies assessed and relied upon by Dr. Weisenburger in forming his conclusions. Multiple animal studies on hydrazines, assessed by Dr. Weisenburger, show their potent carcinogenicity. For example, 1,1 dimethylhydrazine was shown to induce a statistically significant increase of NHL in mice, the same type of cancer that afflicts the plaintiffs in this case. *See* C.C. Haun et al., *A Six-Month Chronic Inhalation Exposure of Animals to UMDH to Determine its Oncogenic Potential,*" Proceedings of the Ninth Conference on Environmental Toxicology, 141–53 (1979) (the "*Haun*" study). Also, a chemically related compound, benzoylhydrazine, produced a significant increase of malignant lymphomas or NHL in mice. 1,2 dimethylhydrazine is an extremely potent carcinogen and has been used to cause colon cancer in rodents for many years and causes significant increases of tumors in a single dose through low chronic exposure. *See* Weisenburger, O.R. at 9. In addition, based on the genotoxicity and carcinogenecity of these chemicals in animals, the EPA and the International Agency for Research on Cancers classified hydrazines as probable carcinogens posing a significant cancer risk to exposed humans. The Court finds that the data analyzed and relied upon in Dr. Weisenburger's report is sufficient to support a general causation conclusion that hydrazines are generally capable of causing NHL in humans.

### 3. N-nitroso compounds & Nitrate Esters [10]

■ The Court finds that Dr. Weisenburger's opinion, that nitrates are general-

**10.** For purposes of this motion, the Court will consider, as Dr. Weisenburger did in his report, N-nitroso compounds and nitrate esters together ("nitrates"). This is chemically logical because nitrate esters are changed within the body to N-nitroso compounds. Nitrate is a breakdown product of nitrogen fertilizers and animal wastes and may be a risk factor for cancer through its role as a precursor compound in the formation of N-nitroso com-

ly capable of causing NHL in humans, is based on sufficient facts and data and sound methodology. Dr. Weisenburger has been extensively involved in two prelitigation epidemiological studies involving the link between nitrate exposure and NHL. He has spent the last ten years or more analyzing available scientific data and creating his own data through scientific studies in this area. Dr. Weisenburger's work has been recognized and utilized by the National Cancer Institute. Dr. Weisenburger testified at the *Daubert* hearing that the two nitrate studies he was involved in generally concluded that a causal association exists between nitrate intake and NHL in humans, though his earlier study established a weaker causal link than the latter. Defendants focus their attack on what these studies actually concluded and the relative weight of the conclusions.

The first study Dr. Weisenburger conducted, *Potential Health Consequences of Groundwater Contamination by Nitrates in Nebraska,* I. Bogardi & R.D. Kuzelka, eds., Nitrate Contamination, NATO Series, Vol. G30, Berlin: Springer–Verlag, 309–15 (1991), was done in response to an "increased incidence and mortality due to non-Hodgkin's lymphoma" reported in certain areas of Nebraska. *Id.* at 309. The report further states, "[s]ince N-nitroso compounds are known to induce NHL in experimental animals (Mirvish et al., 1987) we decided to perform an ecological study of the relationship of NHL to various agricultural practices in Nebraska." *Id.* at 310. The results of the study showed that counties in Nebraska subject to high fertilizer (nitrate) usage and significant ground water contamination by nitrates had a high incidence of NHL.

Defendants' expert, Dr. Grufferman, attacks the weight of this study because of its ecological nature. It is well established in the scientific community that ecological studies are correlational studies and generally provide relatively weak evidence for establishing a conclusive cause and effect relationship. Indeed, Dr. Weisenburger conceded long before this litigation and Grufferman's attack that his study was not definitive, but generated a strong hypothesis that nitrates are linked to NHL. *See* Weisenburger, R.R. 17. However, Dr. Weisenburger also testified that his hypothesis was confirmed five years later in a case-control study funded by the National Cancer Institute ("NCI"). That study was conducted by Dr. Mary Ward and other researchers at NCI. *See* M.H. Ward et al., *Drinking Water Nitrate and the Risk of Non–Hodgkin's Lymphoma,* 7 Epidemiology 465–471 (1996) (the "*Ward*" study). Dr. Weisenburger was a co-author of the *Ward* study. Dr. Ward used Dr. Weisenburger's 1991 ecological study as the basis for obtaining NCI support and funding for the *Ward* study, the objective of which was to follow up on Dr. Weisenburger's hypothesized causal link between nitrate exposure and NHL. The *Ward* study is a case-control study, which is a more reliable study for establishing a cause and effect relationship than an ecological study, and was published in a peer-reviewed journal.

The *Ward* study evaluated drinking water and dietary sources of nitrate as risk factors for NHL in Nebraska. Dr. Weisenburger stated in his report that the basic finding of the *Ward* study was that as nitrate exposure via drinking water increased, a statistically-significant increased risk of NHL was seen. Defendants attack

pounds, many of which are carcinogens. *See Ward* study at 465. Nitrate itself does not appear to present a cancer risk, but acts as a precursor to nitrite which forms via bacterial reduction in saliva or the stomach. Nitrite then reacts with nitrosable substrates in the diet to produce N-nitroso compounds.

this conclusion in several ways. First, they argue that a statistically-significant increase in NHL was seen only in women and not in men. Dr. Weisenburger concedes that the study showed a lower risk of NHL for men than women, but notes that the male group experienced an increased risk of NHL in every dose group, and that when all people exposed to nitrates are assessed for their risk of NHL, there is a statistically-significant increase in the risk of NHL as nitrate exposure increases. *See* Weisenburger, R.R. at 18. Dr. Grufferman also discredited the *Ward* study by noting that users of private well water, similar to the wells used by plaintiffs in this case, did not show a statistically-significant increase in NHL. While true, the population group in this category was small, making it difficult to detect a statistically-significant increase in NHL. Nonetheless, an increased risk of NHL was still seen for those using nitrate-contaminated wells.

Finally,[11] defendants rely on a case, *In re Porter v. Army & Airforce Exchange Service,* Case No. 97 LHC 0346, O.W.C.P. 10–35204 (1997), in which Dr. Weisenburger testified regarding the *Ward* study and his ecological study. Defendants argue that the position he took in the *Porter* case, with regard to the findings of the *Ward* study, is inconsistent with his testimony in the instant case. The Court finds that defendants' attacks go directly to the weight of Dr. Weisenburger's conclusions in this case, and may be developed on cross examination. The Court further finds that Dr. Weisenburger validly relied upon the *Ward* study, and his own previous pre-litigation ecological study, in forming his conclusion that nitrates are generally capable of causing NHL in humans. He employed reliable methodology in reviewing and analyzing scientific literature relating to nitrate exposure and NHL. His conclusions are based on sufficient facts and data and pertain to the facts of this case.

Having found that Dr. Weisenburger's general causation conclusions for hydrazines and nitrates are supported by sufficient facts and data, as well as reliable methodology, the Court now turns to the issue of specific causation.

**Specific Causation**

■ Dr. Weisenburger's methodologies regarding specific causation, or whether the chemicals that plaintiffs' were exposed to more likely than not caused their NHLs, are summarized as follows: 1) confirm diagnosis for each plaintiff; 2) assess the dose received; 3) assess the latency period for each plaintiff, i.e., the date of exposure to the time of diagnosis; and 4) assess potential alternative causes of NHL.

Defendants' assert two main arguments in their attack on Dr. Weisenburger's methodologies and conclusions as they relate to specific causation. First, defendants' attempt to discredit the results of the Mapelton study, as re-analyzed by Dr. Weisenburger. Second, defendants criticize the failure of Dr. Weisenburger to rule out alternative causes of NHL for each plaintiff.

11. Defendants also point to the *Yorkshire* study, which they contend resulted in a negative finding of nitrate exposure and NHL, as opposed to the *Ward* study as interpreted by Dr. Weisenburger. Defendants appear to argue that the Court is faced with the decision of determining which of the two studies is more correct. However, *Daubert* does not require the Court to make such a finding. The Court need only determine if Dr. Weisenburger's conclusions are based on sufficient facts and data and reliable methodologies. The Court need not choose between competing theories to satisfy its gatekeeping function.

### 1. The Mapelton Study

In 1995, the Utah Department of Health conducted an epidemiological study in Mapelton, Utah, to determine whether there was an elevated cancer rate amongst the residents. The results of that study indicated that NHL was not significantly increased in the Mapelton area. However, plaintiffs' expert, Dr. Weisenburger, examined that data and for reasons discussed below, determined there was a statistically-significant increase of NHL in Mapelton. Defendants argue that Dr. Weisenburger's re-analysis of the study is unreliable and therefore inadmissible as evidence.

#### A. Utah Department of Health Conclusions

Due to concerns about RDX and nitrate contamination [12] of the groundwater in Mapelton, Utah, the Utah Department of Health conducted an epidemiology study to determine whether Mapelton residents were experiencing an increase in cancer rates. *See* J. Contreras et al., *An Investigation of Cancer Incidence Rates in Mapelton, Utah, 1978–1995, Final Report, October 1, 1997,* Bureau of Epidemiology, Utah Dept. of Health (the *"Mapelton"* study). Residents of a neighboring county, Salt Lake County, were used as the "control group" from which to develop expected rates of cancer in Mapelton. The authors published the initial report in April 1995, which investigated the cancer incidence in Mapelton from 1978 to 1993. According to the authors of the study, the results of the 1995 investigation suggested that the rate of several cancers were increasing in Mapelton at a greater rate than in Salt Lake County. The cancers that were increasing in Mapelton included prostate cancer, female breast cancer, colorectal cancer, soft tissue cancer, lung and bronchial cancer, and chronic lymphocytic leukemia. The cancers in Mapelton which were found in the 1995 study to be statistically significantly greater than expected between 1978 and 1993 included prostate cancer, cancer of the soft tissue, and chronic lymphocytic leukemia. However, rates of NHL during 1978–1993, were only slightly higher in Mapelton than the Salt Lake County and statewide rates during the same time period, according to the study.

In October of 1997, the Department of Health reevaluated the cancer rates in Mapelton, which added data from 1994 and 1995. The results of the 1997 update did not differ greatly from the previous 1995 report. Concerning NHLs, no statistical differences from the expected count were found in any of the time periods analyzed. As to cancers in general, the study concluded: "this investigation could not establish any etiologic carcinogenic association to chronic nitrate or RDX exposure or a biological basis to conduct further epidemiological work in Mapelton relative to issues of this investigation." *Mapelton* study at 15.

#### B. Dr. Weisenburger's Re-analysis of the Mapelton Study

After analyzing the data relied upon by the Utah Department of Health in conducting the *Mapelton* study, Dr. Weisenburger concluded, contrary to the original results of the study, that during the 1978 to 1993 time period, Mapelton did in fact experience a statistically-significant risk (2.6) of NHL. Dr. Weisenburger also found a statistically significant risk of

12. As discussed above, in 1978 the Utah State Division of Water Quality detected increased nitrate levels in the groundwater beneath Mapelton. In 1986, a containment pond located within defendants' plant ruptured and released nitric acid into the soil and groundwater.

NHL, though to a lesser degree (1.9), when including the data from 1994 and 1995 into his study. There were several pieces of data, not used by the Department of Health, which led Dr. Weisenburger to a different result than the initial Mapelton studies.

First, two of the plaintiffs in this case, Mrs. Peterson and Mr. Ruff, were mistakenly left out of the observed NHL cases in Mapelton during the studied time period.[13] Dr. Weisenburger included these two NHL cases in his statistical re-analysis of the study. The inclusion of these statistics is not seriously questioned by the defendants. Second, Dr. Weisenburger combined the cases of chronic lymphocytic leukemia (CLL) and non-Hodgkin's lymphoma (NHL) for purposes of determining whether or not there was an increase of NHL in Mapelton. Defendants' expert, Dr. Grufferman, vigorously attacks the inclusion of CLL in the Mapelton study, and argues that it is unconventional within the scientific community to do so. However, Dr. Weisenburger's reasons for combining CLL and NHL are persuasive. He justified this method in stating that CLL and small lymphocytic NHL (SLL) are tumors of the same type of lymphocyte and are named differently based solely on whether the stage of the disease is in the blood and bone marrow (CLL) or only in other tissues such as lymph nodes (SLL). Dr. Weisenburger testified that the close relationship of CLL to SLL has been accepted for some time in the scientific community. He cites to a World Health Organization ("WHO") publication classifying CLL and small lymphocitic NHL as the same disease. Dr. Weisenburger himself proposed the CLL/NHL classification in a pre-litigation 1992 article. *See* Weisenburger DD., *Pathological Classification of non-Hodgkins lymphoma for epidemiological studies,* Cancer Res. 52 (suppl): 5456s–5464s, 1992. In 1999, the WHO consensus group, when asked whether CLL and SLL were simply different stages of the same disease, answered "yes." J. Clin. Oncol.1999; 17:3835–49.

Dr. Weisenburger concludes in his report that "[s]ince SLL is a form of NHL, there is absolutely no reason not to include CLL with NHL when performing epidemiologic studies to determine causation." Weisenburger, R.R. at 25.

Defendants' expert, Dr. John Ward, who is Chief Oncologist at the University of Utah and the Huntsman Cancer Institute also agrees that SLL and CLL are essentially the same disease with the same etiology:

> **Question.** When, hypothetically, science finds the causes of SLL, do you have any reason to believe that they will be any different causes from those of CLL?
>
> **Answer:** No.
>
> **Question:** Based upon your answer to the last question, if you were going to do an epidemiologic study looking for a cause of CLL, would you treat them differently?
>
> **Answer:** No.

*See* Ward Deposition at 77–78. Defendants have not offered the Court, through an expert or otherwise, a persuasive reason as to why the combining of CLL and NHL in an epidemiology study is not reliable methodology. Defendants' expert, Dr. Grufferman, does point out that the *Ward* study counted NHLs separately from CLLs. Dr. Weisenburger testified,

13. The Utah Cancer Registry mistakenly reported that Mrs. Petersen and Mr. Ruff were residents of Springville, a community neighboring Mapelton, at the time of their NHL diagnosis. These individuals were in fact residents of Mapelton at the time of their diagnosis.

however, that convention had not changed at that time and that in the future he would follow the WHO classification and include CLL as part of NHL.

Given that the WHO and defendants' own medical expert agree with the method of combining CLL and NHL for epidemiological purposes, the Court finds that Dr. Weisenburger's use of this method when analyzing the Mapelton data was reliable. Defendants are really attacking the results of this study as opposed to the methods. As Dr. Harber testified, "Dr. Grufferman's statements regarding the Mapelton study are not methodologic criticisms. Rather, they are a difference of opinion with respect to what weight to give the various pieces of data." *See* Harber, O.R. at 3. Accordingly, the Court finds that Dr. Weisenburger validly relied upon his analysis of the *Mapelton* study for his specific causation conclusions.

Defendants' next argument with respect to Dr. Weisenburger's methods in the specific causation area is that he failed to rule out the most common cause of NHL, "chance." Defendants proffered the testimony of Dr. John Ward for the proposition that the vast majority of NHLs are considered by medical science to be spontaneous, i.e., without a known cause. Accepting this proposition as true, the Court finds that it goes to the weight of Dr. Weisenburger's specific causation conclusion and not its admissibility. The fact that a majority of NHL cases have no known cause does not preclude a medical doctor from identifying a likely cause of NHL in a specific case. These are not mutually exclusive propositions. For example, defendants also argue that familial predisposition to NHL is a potential cause of the disease. If Mrs. Peterson, for instance, had a long family history of NHL, one could come to the reasonable medical conclusion that the cause of her NHL was more likely than not genetic. This conclusion would not disturb Dr. Ward's testimony that the vast majority of NHLs are diagnosed without a known cause.

In the instant case, Dr. Weisenburger examined the medical histories of each plaintiff when confirming their diagnosis. He met with each plaintiff and asked them about any alternative exposures that might explain their NHL. He inquired about their occupations, previous environments and other data that might explain their NHLs. Based on his twenty plus years of experience in investigating causes of NHLs, Dr. Weisenburger ruled out other possible causes of NHL. Dr. Weisenburger testified that there was nothing in their records or medical history that was a likelier cause than the contaminants. Dr. Harber's response to defendants' criticisms here is also persuasive:

> Certain chemicals and exposure scenarios are simply more likely to have effects than others. There are reasonable approaches to establish the reasonableness of a conclusion as to the likelihood that a particular exposure had a particular effect. Dr. Weisenburger's approach, as described earlier, is such a reasonable approach.

Harber O.R. at 4.

The Court finds that Dr. Weisenburger employed reliable methods in reaching his conclusion that the contaminants at issue more likely than not caused plaintiffs' NHL.

**2. Dr's. Philip Guzelian and Robert James**

Plaintiffs move to limit or exclude the opinions of Dr's. Philip Guzelian and Robert James who are both toxicologists, and have co-authored an expert report proffered by defendants. The purpose of their report is to challenge the theories and scientific methodologies of plaintiffs' expert, Dr. Weisenburger. In their report,

they opine that Dr. Weisenburger's methods and theories are not within the mainstream of science. For the reasons stated in defendants' briefs, this Court finds that Drs. Guzelian and James are qualified as experts to testify on the issue of whether Dr. Weisenburger's methodology and resulting theories regarding causation fall within the mainstream of science.

### 3. Dr. John Ward

Plaintiffs also move to exclude the expert testimony of Dr. John H. Ward, regarding the cause of NHL. Dr. Ward's report challenges Dr. Weisenburger's theory of causation wherein food and water contaminated by RDX causes NHL if ingested by humans. Plaintiffs claim that Dr. Ward is not qualified as an expert because he knows little or nothing about the explosives and chemicals at issue in this case and has not performed independent research on the causes of NHL, nor has he read Weisenburger's report.

Dr. Ward is the chief of oncology at the University of Utah Medical Center and the Huntsman Cancer Institute. As such, he has experience in the mainstream medical diagnosis and treatment of NHL patients and regularly studies mainstream medical reports and data about NHL. Defendants argue that Dr. Ward's qualifications are adequate to proffer his testimony that there is no known cause of NHL. Based on the defendants' briefs and Dr. Ward's professional position and experience noted above, this Court finds he is qualified to opine as to whether there are any known causes of NHL.

### CONCLUSION

For the reasons stated above, the Court (1) DENIES defendants' combined motion for summary judgment and motion in limine to exclude Dr. Dennis Weisenburger's opinions regarding Hydrazines and Nitrates, (2) GRANTS defendants' motion as it relates to RDX by itself, (3) DENIES plaintiffs' motion in limine to exclude the expert testimony of Dr's. Philip Guzelian and Robert James, and (4) DENIES plaintiffs' motion in limine to exclude the expert testimony of Dr. John Ward.